LAWRENCE MERRYMAN *v.* ADMINISTRATOR, UNEMPLOYMENT COMPENSATION ACT, ET AL.

SUPERIOR COURT     HARTFORD COUNTY     FILE No. 125520

JAMES LOMBARDO *v.* ADMINISTRATOR, UNEMPLOYMENT COMPENSATION ACT, ET AL.

SUPERIOR COURT     HARTFORD COUNTY     FILE No. 125521

Memorandum filed January 31, 1962

*Norman Zolot,* of Hamden, for the plaintiff in both cases.

*Robert H. Arnold,* of East Hartford, for defendant United Aircraft Corporation in both cases.

*Albert L. Coles,* attorney general, and *Harry Silverstone,* assistant attorney general, for defendant Administrator, Unemployment Compensation Act, in both cases.

MACDONALD, J. This is an appeal by the employer, United Aircraft Corporation, from the granting, by the commissioner, of unemployment

compensation benefits to two employees, the named claimants, Merryman and Lombardo, without imposition of the statutory disqualification penalties provided by § 31-236 of the General Statutes. Although there are slight variations in the facts, it has been agreed by counsel that the issues are identical and that two cases may be treated, for the purposes of this appeal, as one.

The two claimants, who had been employed for several years prior to May 13, 1960, by the Pratt and Whitney Aircraft Division of United Aircraft Corporation in East Hartford, were laid off on that date because of lack of work. On June 8, 1960, an economic strike was called at the plant where claimants had been employed, which strike continued for a number of weeks. During the strike, on June 30, the employer sent a telegram to each of the claimants as follows: "We have the job available in your seniority area. Please report to Employment Office by July 7th or you will be dropped from recall list." To this, each claimant replied: "This will acknowledge your telegram and I wish to inform you I will accept the job now open. However I am joining the strike and will report to work at the conclusion of same." Both claimants thereafter joined the picket lines at the plant and were paid $35 a week strike benefits. Upon these facts, the commissioner found that the employer had offered claimants "new work that was unsuitable because its existence was due directly to a strike" and sustained the decision of the administrator by concluding that under § 31-236 (1) claimants did not have to accept the work offered and that they were entitled, therefore, to benefits without imposition of the disqualification penalties.

Before considering the principal issues involved, it should be noted that claimants, in their brief as well as in oral argument, have questioned the em-

ployer's right to appeal under the Connecticut Unemployment Compensation Act, more specifically, §§ 31-241 and 31-249 of the General Statutes. Although this question properly should have been raised by a formal motion to dismiss, it will be disposed of here briefly. Section 31-241 provides first that notice be sent to employers against whose merit rating accounts compensable separation charges might be made and then sets forth the following proviso, added by amendment (Sup. 1947, § 1393i) in 1947: " . . . provided any employer who claims that the claimant is ineligible for benefits because his unemployment is due to the existence of a labor dispute at such employer's factory, establishment or other premises, shall be notified of the decision and the reasons therefor, whether or not a compensable separation due to benefits awarded by the decision might be charged against such employer's merit rating account." It is provided thereafter in this section that employers who have received notification may appeal from the examiner's decision to the commissioner and under § 31-249, if aggrieved by the commissioner's decision, may appeal therefrom to the Superior Court. It seems abundantly clear that the 1947 amendment was intended to permit any employer to contest the payment of benefits "who claims that the unemployment is due to a labor dispute at his factory, establishment or premises." *Winchester Repeating Arms Co.* v. *Radcliffe,* 134 Conn. 164, 168. This is the specific claim made by employer in paragraph 2 of each appeal, and the appeals are entirely in order.

Another question raised by separate "Reasons of Appeal," and which is really preliminary to the principal issue, has to do with the commissioner's decision on employer's motion for correction of findings of fact, notably his refusal to add proposed paragraph 13, set forth in the motion, to the effect

that "it was the policy of the Company, even though the contract (with the union) had expired to recall laid-off employees on the basis that the employee had recall rights under the expired contract." The essence of this proposed finding was clearly set forth without contradiction or question by Mr. Stewart at the November 1, 1960, hearing before the commissioner and, for reasons which will appear hereafter, has an important bearing on the decision of these appeals. The finding should have been corrected in this regard. It is difficult to see why the commissioner refused to strike paragraph 8 of his finding and substitute the paragraph proposed by employer, in view of the inclusion in paragraph 4 of his decision of a reference to the company's telegram to claimants followed by the words: "The return would have been to his former job, although there would have been no recall if the strike had not occurred." This language indicates that the commissioner regarded the company's telegrams as recalls to claimants' former jobs in reaching his decision, despite his refusal to so find for the record.

The principal question raised by these appeals is whether an employee who has been laid off for lack of work several weeks prior to the commencement of a strike at the factory where he worked is required, when he is recalled during the strike, to return to work at his former job, to which, but for the strike, he probably would not then have been recalled. The employer takes the position that he is so required and that where, as here, he (1) has refused to return during the strike because he is joining the strike and will return upon its termination and (2) has actively served on the picket line and received strike benefits, he has refused suitable employment and is ineligible for unemployment benefits. This is based upon the theory that his "unemployment is due to the existence of a labor dispute at the factory

. . . at which he is or has been employed," which dispute it has not been shown that "he is not participating in or financing or directly interested in" and "which caused the unemployment," as expressly provided in § 31-236 (3).

Claimants, on the other hand, urge the position taken by the commissioner that such employee is not required to return to his job during the strike because (1) the collective bargaining agreement between the company and the union having terminated prior to his layoff, he had no contractual seniority right to the job; (2) despite the fact that the recall was to his former job, it was "new work," vacant due to the existence of a labor dispute, and therefore unsuitable within the meaning of § 31-236 (1), permitting him to refuse to accept new work "[i]f the position offered is vacant due directly to a strike, lockout or other labor dispute." In other words, claimants' position, as stated bluntly in their brief, is that the law does not require them to become strikebreakers in order to obtain the benefits afforded by the Unemployment Compensation Act without penalties.

Since the commissioner's finding that "the job that was offered to the claimant was vacant due directly to the strike" was not challenged by employer's motion to correct, it will be assumed that this was the situation, despite the question raised in employer's brief as to the justification for such a finding on the testimony produced. This narrows the issue down to the interpretation of the phrase "new work" and leaves for the determination of the court, more specifically, the question whether a claimant's former job is "new work" within the meaning of the statute when offered, during a strike, to one who had been laid off for lack of work approximately four weeks before the strike, and in a situation where the collective bargaining agree-

ment between claimant's union and employer had expired prior to the layoff.

The answer to the question raised and the interpretation of the term "new work" under the circumstances of this case are of some importance because of the fact that every state unemployment compensation law must conform to the federal act if that state is to receive credit against the tax imposed by the Federal Unemployment Tax Act. Section 3304 (a) (5) of the Internal Revenue Code of 1954 (formerly § 1603 [a] [5] of the Internal Revenue Code of 1939 as amended) outlines specific conditions which must be met by a state act as a prerequisite for credit against the tax imposed by the federal act, one of such requirements being the inclusion in such state act of a provision like or similar to that portion of § 31-236 (1) of our Connecticut act which states that benefits shall not be denied "for refusing to accept new work . . . [i]f the position offered is vacant due directly to a strike, lockout or other labor dispute." Since such language must appear in our statute to assure its conformity to the federal requirements, it should be read in the light of the legislative intent of Congress—more specifically as to the meaning of "new work"—and for the ultimate authority on this intent, as tied in with the purpose of the federal act, we must turn to statements and rulings of the United States secretary of labor.

In the so-called Washington Conformity case, involving the question whether the Washington Unemployment Compensation Act was in conformity, a ruling approved by the secretary of labor on December 28, 1949, stated that the term "new work" must be interpreted to carry out the legislative intent "to prevent States from using their unemployment compensation laws to compel new workers, under the threat of a denial of unemployment com-

pensation benefits, to accept strikebound jobs." However, the opinion continues, the term "new work" presupposes an absence of an employment relationship between applicant and prospective employer, stating specifically that "where an individual has no employment relation with any employer and no attachment to any employer or to a job with any employer, all work that may be offered him is 'new work' within the meaning of section 1603 (a) (5) [of the Internal Revenue Code of 1939]." See 1A CCH Unemployment Ins. Rep. ¶ 1965.

In reaching his decision in the California Conformity case, reported in Ben. Ser., FSLS-315.05-1 (April 24, 1956), the secretary of labor sought the advice and assistance of a panel of distinguished authorities which was consulted, in the secretary's own words, "because of the severity of the sanctions provided by the statute and the extraordinary importance of the direct and indirect effects the decision in this case could have in the State of California and as a precedent for comparable situations in other States." It seems singularly appropriate, applying the secretary's words to our Connecticut situation here involved, to turn to the views of this "distinguished panel of lawyers" as set forth in their report, titled "Special Advisory Panel's Decision." Ben. Ser., FSLS-315.05-17. In commenting on the secretary's conclusions in the Washington Conformity case, supra, the panel states: "His conclusion as to what constitutes 'new work' . . . recognized that where an individual has an employment relation with any employer or an attachment to any employer or to a job with any employer, 'new work' is not involved. . . . Consequently we conclude that 'new work' presupposes not only the absence of an employment relationship between the claimant and an employer but also the absence of an attachment to any employer or to a job with any

employer." Id., 315.05-25. The panel then proceeds, in discussing the question of job attachment, to point out the importance of the decision of the United States Supreme Court in *Unemployment Compensation Commissioner* v. *Aragon,* 329 U.S. 143 (1946), which, in the opinion of the panel, "supports the right of a state . . . without suffering loss of federal unemployment tax credit, to disqualify a claimant for unemployment compensation when it finds that he is voluntarily without work because of a labor dispute involving his work— that is, work which was his when it was last being done. . . . Consequently, here is a positive decision [by the Supreme Court], that certain claimants are disqualified because of a labor dispute involving 'their jobs,' even though there was no contract, and even though the claimants were not working when the dispute arose." Ben. Ser., FSLS 315.05-26.

After considering a decision somewhat similar to the *Aragon* case, supra—that of *American-Hawaiian Steamship Co.* v. *California Employment Commission,* 24 Cal. 2d 716 (1944)—the panel reasons (Ben. Ser., FSLS 315.05-30) that since there had been a contract right on the part of each claimant as a registered union member to a share of the available work, although the contract had expired, this plus the practice thereafter and before the work stoppage "entitled each claimant as a registered member of the union to his share of available work based upon the rotation of assignments through the registered members." The panel then concludes that "[c]onsequently although there was no employment relationship or contract right to a job at the time of the labor dispute, there was an attachment to a job with any one of several employers. This job attachment establishes the work involved as the claimant's work, and not 'new work' under the *Hawaiian* case and the *Aragon* case."

Obviously, much of the language quoted above from the report and recommendations of what the secretary of labor considered a panel of distinguished experts has striking applicability to the case before us. If the commissioner had found, as the uncontradicted evidence at the hearing indicated and as requested by employer, that "it was the policy of this Company, even though the contract had expired, to recall laid-off employees on the basis that the employee had recall rights under the expired contract," it seems quite clear that claimants at the time of recall had an "attachment" to, if not an actual employment relationship with, the company. They had neither quit their jobs nor been discharged, but had been laid off for lack of work. They were no longer actually performing services for the company, and it might be stretching the point a bit to say that their original contract of hire had not been terminated. Although even that point is at least arguable, it is not necessary to go that far, for if these claimants had a legally enforceable right, or even an attachment to their old jobs, the work was "their work" and not "new work." With respect to the question of their "right" to their former jobs, it has been held recently by the United States Court of Appeals, Second Circuit, that seniority rights of employees survive expiration of the contract granting them. In *Zdanok* v. *Glidden Co.*, 288 F.2d 99, 103 (2d Cir. 1961), the court states: "These rights . . . though they arise solely and only out of the terms of the union agreement with the defendant, have been treated as 'vested' rights and are being voluntarily honored by the defendant. This was, we suppose, because the employees had earned these rights by compliance with the terms of the contract, and the fact that the contract was not renewed, and that other workmen in the future might not have the opportunity to earn similar

rights, was irrelevant." See also *Oddie* v. *Ross Gear & Tool Co.,* 195 F. Sup. 826 (D.C. Mich. 1961).

Here, of course, it might be argued that there is no enforceable contract right because of the absence of a finding as to the length of time during which claimants' seniority rights would survive, but even so it might well be held that they still have a legally enforceable right to their old jobs. In *Leiter Mfg. Co.,* 112 N.L.R.B. 843, 36 L.R.R.M. 1123, 1124, 1125 (1955), it was held that an employee who had been laid off, was recalled during a strike, and refused to return, thereby became a striker and was legally entitled to reinstatement at the conclusion of the strike upon his request and if he had not been permanently replaced. The strike in that case, as here, was an economic strike. See *Ekco Products Co.,* 117 N.L.R.B. 137, 39 L.R.R.M. 1184, 1190 (1957). However, it is not even necessary to find a legally enforceable right to the old job when a broad interpretation of the word "attachment" will accomplish the same results. The former contracted relationship and other circumstances mentioned above establish, if not a legally enforceable right, at least an attachment to the old jobs. Claimants clearly had such attachment to the company and, of more importance, to these specific jobs, by reason of their long employment in such jobs prior to the layoff and by reason of the company's retention of their names and addresses on its personnel lists, as shown by the very fact that it made direct contact with them when work was available. Even in claimants' brief, it is admitted that laid-off employees "may have dormant rights." On the basis of this attachment, even if claimants had only a reasonable expectancy, based on past employment practices, of being recalled, rather than a contractual or legally enforceable right thereto, they certainly are not strangers to the proffered jobs, and such jobs are

"their work" rather than "new work." See Report of Employment Security Legal Affairs Conference, Regions I, II & III, Hartford, Conn., pp. 81-103 (Sept. 10-12, 1958).

The statement in claimants' brief that "the law does not require any claimant to become a strike-breaker" is not strictly true even where a claimant had no prior relationship to the employer, for under our Connecticut law no person whose unemployment is due to a labor dispute can receive benefits unless he shows that he is not participating in a strike. Such nonparticipation may involve a willingness to cross a picket line or, in effect, to become a strike-breaker. See *Lanyon* v. *Administrator,* 139 Conn. 20, 32, 33; *Baldassaris* v. *Egan,* 135 Conn. 695, 700.

Somewhat along the same line is this statement at the end of claimants' brief: "If the company is permitted to prevail in this case, the state has abandoned its neutrality in a labor dispute because it will require laid-off employees to become strike-breakers . . . ." It might be said, on the other hand, that the state would be abandoning its neutrality in the other direction if an interpretation of its law permits benefits from an employer-financed fund to be paid to striking claimants who at the same time are receiving strike benefits for their picketing activities. Such an interpretation surely would go far beyond the purpose of our Unemployment Compensation Act, which is to provide income for those who, through no fault of their own, cannnot find work, and which was "designed to ameliorate the tragic consequences of unemployment." *Waterbury Savings Bank* v. *Danaher,* 128 Conn. 78, 82. Claimants here should be in no better position than if they had returned to their old jobs and then immediately thereafter walked out on strike. By agreeing, instead, to return as soon as the strike was over, they are just as clearly going

out on strike and, furthermore, have actively participated in the strike. In a very recent decision by the New York Supreme Court, Appellate Division; *Matter of George (Catherwood)*, 15 App. Div. 2d 308, 309; reversing the granting of benefits to 10,000 General Motors Corporation workers idled by a parts shortage resulting from a strike at other General Motors plants, the court used the following language: "Their unemployment during the period for which they have been granted benefits was the direct and inevitable consequence of the strike in which they joined. They are not innocent victims of a situation wholly beyond their control, and their unemployment may not be said to be involuntary." This language seems peculiarly applicable to the claimants in this case.

The work offered to these claimants was not "new work" within the meaning of that portion of § 31-236 providing that benefits shall not be denied "for refusing to accept new work . . . [i]f the position offered is vacant due directly to a strike, lockout or other labor dispute." On the other hand, within the meaning of subsection (3) of the same section, the unemployment of these claimants clearly was "due to the existence of a labor dispute at the factory" at which they had been employed, a dispute in which they were not only directly interested but were actively participating.

The appeals are sustained, the awards of benefits are vacated and these two cases are remanded to the commissioner for the entry of new awards holding the claimants ineligible for benefits for the duration of the labor dispute.